# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | | |
|---|---|---|
| **MICHAEL G. MALIN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case number 4:11cv1320 TCM** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security (Commissioner), denying the applications of Michael Malin (Plaintiff) for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381-1383b, is before the undersigned for a final disposition pursuant to the written consent of the parties.  See 28 U.S.C. § 636(c).  Plaintiff has filed opening and reply briefs in support of his complaint; the Commissioner has filed a brief in support of his answer.

## Procedural History

Plaintiff applied for DIB and SSI in August 2008, alleging he was disabled as of September 1, 2004, by chronic angina, chronic obstructive pulmonary disease (COPD),

hepatitis C, congestive heart failure, anxiety, and stress.  (R.[1] at 132-36, 141-46.)  His applications were denied initially and after a hearing held in May 2010 before Administrative Law Judge (ALJ) Thomas C. Muldoon.[2]  (Id. at 15-27, 32-47, 54-56, 61-65, 68-72.)  The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 1-3, 7-9.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, was the only witness to testify at the administrative hearing.

Plaintiff testified that, at the time of the hearing, he was 53 years old and lived in an apartment.  (Id. at 35, 36.)  His mother and sons help him with his bills.  (Id. at 39.)  He graduated from high school.  (Id. at 36.)  He does not have any health insurance and receives his medical care at the Veterans Administration (VA).  (Id.)  When in the Army, he was trained in wheel and track mechanics.  (Id. at 36-37.)  He used that training for approximately two years after being honorably discharged.  (Id.)

Asked to describe the jobs he had held for the last fifteen years, Plaintiff testified that he had done landscaping, sold firewood and mulch, and worked at a box factory running a fork-lift and picking up trash.  (Id. at 37.)  Plaintiff tried to do landscaping work in 2010.  (Id. at 39.)  In March and April of that year, he earned a total of $380 in cash in each of the two

---

[1]References to "R." are to the administrative record filed by the Commissioner with his answer.

[2]Plaintiff had previously applied in July 2005 for DIB and SSI.  (Id. at 18.)  Those applications were denied initially and dismissed in January 2007 "due to abandonment."  (Id.)

months.  (Id. at 39-40.)  Plaintiff was unable to do the work.  (Id. at 40.)  He would become out of breath and tired and start having chest pains.  (Id.)  Also, his feet would hurt.  (Id.)

Plaintiff is being treated for heart disease, high blood pressure, hepatitis C, and Rosaceae.  (Id. at 41.)  The medication he was taking for the Rosaceae made him sick, so he had to stop it.  (Id.)  Walking uphill, walking up a level, or climbing stairs makes him short of breath.  (Id.)  He usually takes a ninety-minute afternoon nap.  (Id.)  Also, if he stands or walks too long, his ankles hurt and become swollen.  (Id. at 42.)  If he sits for too long, Plaintiff has to get up and move around because his joints start hurting and his feet start swelling.  (Id. at 43.)  And, his neck hurts.  (Id.)

Asked to describe a typical day, Plaintiff replied that he takes his medicine when he gets up in the morning, has a cup of coffee, fixes something to eat, takes a shower, does a crossword or reads a magazine or paper, goes out front, comes in and eats, and lays down for an hour.  (Id. at 44.)  His sons, one 23 years old and one 27, live in the apartment building and often knock on his door to check on him.  (Id.)

Plaintiff does not have a driver's license because he refused to take a breath test four years earlier.  (Id. at 37-38.)  Five years ago, he was in a program for alcohol abuse.  (Id. at 38.)  Now, he seldom drinks alcohol.  (Id.)  The last time he did, it was two years ago on his birthday.  (Id.)  He used to smoke three packs of cigarettes a day; he now smokes approximately one pack a day.  (Id.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms completed as part of the application process, documents generated pursuant to Plaintiff's applications, records from health care providers, and assessments by examining and non-examining consultants.

When applying for DIB and SSI, Plaintiff completed a Disability Report. (Id. at 166-75.)  Under contacts, he listed his mother and Peggy Keith, a friend.  (Id. at 166.)  He listed his height as 5 feet 10 inches tall and his weight as 207 pounds.  (Id.)  He was limited in his ability to work by chronic angina, COPD, hepatitis C, congestive heart failure, anxiety attacks, and stress.  (Id. at 167.)  Because of these impairments, no one would hire him.  (Id.)  He could not go out in the heat; constantly felt bad; could not be far from a bathroom for the first few hours after he woke up; could not walk far; had to stop often; had difficulty walking in the morning because of painful, swollen feet; could not lift anything too heavy; and had problems remembering things.  (Id.)  These impairments first bothered him on September 1, 2004, when he had a heart attack and prevented him from working that same day.  (Id. at 167-68.)

Asked on a Function Report to describe what he does after he wakes up each day, Plaintiff replied that he makes coffee, takes his medications, reads the paper, showers, takes out the trash, cleans the rooms,[3] naps, sometimes takes a short walk, watches televison, takes his evening medications, and fixes a meal.  (Id. at 190-97.)  He has difficulty sleeping

---

[3]At this time, Plaintiff was cleaning rooms at the hotel where he was then living in exchange for free lodging.

through the night without medication.  (Id. at 191.)  He sometimes has to leave himself a note to take his medications.  (Id. at 192.)  He fixes sandwiches and heats frozen dinners for his meals.  (Id.)  He sometimes fixes a meal in a crockpot.  (Id.)  He does not have a kitchen.  (Id.)  He sometimes needs help from the motel owner when cleaning the rooms.[4]  (Id.)  Because of his impairments, he does not get out very much; he does not feel very sociable.  (Id. at 195.)  His impairments affect his abilities to lift, walk, kneel, climb stairs, remember, complete tasks, concentrate, and understand.  (Id.)  He cannot lift anything heavier than twenty pounds.  (Id.)  How far he can walk depends on several factors, including the weather and the incline.  (Id.)  How long he can pay attention depends on his interest in the subject.  (Id.)  He finishes what he starts "most times."  (Id.)  He can follow written instructions okay, but not spoken ones.  (Id.)  He does not handle stress or changes in routine well.  (Id. at 196.)  When in a public place, he is afraid he will have a heart attack.  (Id.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of his applications.  (Id. at 202-08.)  There had been no change in his impairments since he last completed a disability report.  (Id. at 203.)  His current medications included two for high blood pressure, i.e., Furosemide and Metoprolol[5]; two for "heart problems," i.e., Digoxin and

---

[4]See note 3, supra.

[5]A third, "Tartrate," is also listed.  Tartrate is a salt of tartaric acid, which is a dihydroxysuccinic acid "used in the manufacture of various effervescing powders, tablets, and granules."  Stedman's Medical Dictionary, 1763 (26th ed. 1995) (Stedman's).  For instance, Metoprolol tartrate is listed elsewhere as one of Plaintiff's medications.  (See R. at 247.)

Lisinopril; one, Albuterol, for breathing problems; and one for acne.[6]  (Id. at 205.)  None had any side effects.  (Id.)

Plaintiff had reportable annual earnings in 1990 through 1995, inclusive, and 1998 through 2002.  (Id. at 160.)  His highest annual earnings were $14,239, in 2002.  (Id.)

The relevant medical records before the ALJ are summarized below in chronological order and begin on May 13, 2005, when Plaintiff had an exercise stress test at the VA Hospital and tested positive for ischemia.  (Id. at 255, 267-68, 364, 372.)  He was prescribed Imdur to help his chest pain and was scheduled for an angiogram at the VA Hospital in Memphis.  (Id. at 364-65, 366.)  The angiogram was normal with the exception of showing a decreased ejection fraction of 45 to 50 percent[7] in the left ventricle and basal inferior hypokinesis.[8]  (Id. at 541.)

It was noted on May 31 that Plaintiff had refused antidepressants because he felt they had affected his sons.  (Id. at 256.)  The following month, Plaintiff consulted the health care providers at the VA Clinic for hepatitis, reporting that his wife had died ten years earlier.  (Id. at 260.)  He was unemployed.  (Id. at 261.)    The hepatitis infection would not be treated until Plaintiff was able to maintain alcohol sobriety for at least six months.  (Id. at 262.)

_____

[6]Another, Spironololactone, is listed without an indication of the reason for its prescription. This medication prevents a body from absorbing too much salt, as does the Furosemide.

[7]"A normal [left ventricular] ejection fraction is 55 to 70 percent."  Martha Grogan, M.D., Ejection fraction: What does it measure?, http://www.mayoclinic.com/health/ejection-fraction/AN00360 (last visited Aug. 16, 2012).

[8]Hypokinesis is "[d]iminished or slow movement."  Stedman's at 836.

Plaintiff returned to the VA Clinic on August 3, complaining of bilateral ankle pain that was a six on a ten-point scale.  (Id. at 355-57.)  Two months later, he was seen for a follow-up appointment.  (Id. at 348-51.)  He described his ankle pain as a five on a ten-point scale.  (Id. at 350.)  The pain was constant, sharp, and stabbing and made worse by standing, walking, and going up steps.  (Id.)  Nothing relieved the pain, which had begun more than a year earlier.  (Id.)

The next medical record is dated July 27, 2008, and is of Plaintiff's admission to the VA Hospital with a history of shortness of breath and COPD, depression, post-traumatic stress disorder (PTSD),[9] and hepatitis C.  (Id. at 246.)  He had not taken his hypertension medication for two years.  (Id. at 319.)  He informed another provider that he had not taken any of his prescribed medications for three years.  (Id. at 325, 469, 472.)  He was described as being non-compliant with medical care.  (Id. at 330.)  On admission, his blood pressure reading was 176/106.  (Id. at 303, 463.)  He was 5 feet 10 inches in height and weighed 212 pounds.  (Id. at 324.)  He was admitted for COPD with hypertension.  (Id. at 320, 464, 618.)  It was noted that he had been living in a hotel for the past two years and was being given room and board in exchange for cleaning rooms.  (Id. at 246, 249, 409.)  He drank a twelve-pack of beer a day for five days a week and smoked two packs of cigarettes a day, as he had for forty years.  (Id. at 246, 407, 541.)  Customers of the hotel would leave him alcohol and

---

[9]Reference is made in the May 2005 VA medical records to Plaintiff having "signs and symptoms" of PTSD in the same paragraph as references to him being depressed, not taking any medication, having lost his home in the 1993 flood, to his sons being in prison, to him having been "in a lot of trouble," and to being on the verge of losing his home again, this time due to foreclosure. (See id. at 364.)  No other explanation of Plaintiff's PTSD diagnosis appears in the medical records.

cigarettes as a tip.  (<u>Id.</u> at 249, 311, 409, 455, 544.)  His wife had died three years earlier[10];

his two sons were grown men with addiction problems and no permanent place to leave.  (<u>Id.</u>

at 249, 311, 410, 609.)  When a social worker discussed staying at the VA's substance abuse

residential care facility for two weeks, Plaintiff explained that he did not want to stop

drinking.  (<u>Id.</u>)  He became short of breath on exertion and had occasional chest pains.  (<u>Id.</u>

at 246.)  On a depression screen test, he answered "more than half the days" to the questions

whether he had little interest or pleasure in doing things; whether he felt down, depressed,

or hopeless; whether he had trouble falling or staying asleep or sleeping too much; and

whether he was tired or had little energy.  (<u>Id.</u> at 325-26, 469-70, 624.)  He answered "not

at all" to the question whether he had trouble concentrating and to four other questions.  (<u>Id.</u>

at 326, 470.)  He screened positive for depression.  (<u>Id.</u>)

A Doppler echocardiogram performed the day after Plaintiff was admitted revealed

tachycardia; mitral and tricuspid regurgitation; enlargement of the left atrium and ventricle

with myocardial thickening; and a markedly abnormal left ventricle ejection fraction of 29

percent.  (<u>Id.</u> at 223-26, 388-91.)  A chest x-ray taken the same day revealed cardiomegaly

(enlargement of the heart[11]).  (<u>Id.</u> at 227, 391-92.)  His cardiac size appeared larger than it had

in April 2005.  (<u>Id.</u>)  The next day, it was noted that Plaintiff was not sleeping very well due

to the beds and requested sleep medication.  (<u>Id.</u> at 301, 303, 447, 600.)  He was not in pain

or uncomfortable.  (<u>Id.</u> at 303.)  He was alert and oriented to time, place, and person.  (<u>Id.</u>)

---

[10]Plaintiff and his wife were separated at the time of her death.

[11]<u>See</u> <u>Stedman's</u> at 281.

He requested a medication or other help for his depression in order to quit drinking.  (Id. at 304, 44.)  When seen by the addiction therapist, however, Plaintiff stated that he did not want treatment for his drinking and explained that he had quit before on his own and could again.  (Id. at 309, 411, 453.)

A cardiologist, Ankineedu Kavuru, M.D., examined Plaintiff, finding he had a regular, mildly tachycardic[12] heart rate and poor pedal pulses.  (Id. at 542, 604.)  The heart monitor revealed one episode of supraventricular tachycardia,[13] occasional premature ventricular contractions, and mild tachycardia.  (Id.)  In addition to continuing Plaintiff's medications, Dr. Kavuru recommended that Plaintiff stop smoking, reduce his drinking, "and take aggressive risk modifying measures."  (Id. at 542, 605.)  It was noted on July 30 that Plaintiff was tachycardic – he had a heart rate of 118[14] – after he walked from the outside back to his room.  (Id. at 297, 441, 595.)  It was also noted that he went outside frequently to smoke and walked with a steady gait and no assistive device.  (Id.)  He was sleeping well.  (Id. at 300.)

Plaintiff declined to undergo a psychiatric evaluation, explaining that he would see a psychiatrist near his home "as instructed by his lawyer."  (Id. at 244, 404, 539.)

When discharged on August 1 in "fair condition," Plaintiff was "strongly urged to quit smoking, cut down drinking, and take aggressive risk modifying measures," including a low-sodium diet.  (Id. at 242, 402, 526.)  The primary diagnosis was congestive heart failure; the

---

[12]Tachycardic is defined as "[r]elating to rapid heart rate."  Id. at 1758.

[13]Tachycardia is "[r]apid beating of the heart, conventionally applied to rates over 100 per minute."  Id.

[14]See note 13, supra.

- 9 -

secondary diagnoses were COPD, hypertension, PTSD, depression, and hepatitis C.  (Id.)
He was walking without an assistive device, and his pain was under control.  (Id. at 280.)
He was to continue taking his current medications.  (Id. at 242.)  Because of his congestive
heart failure, he was also encouraged to weigh himself daily and to contact the VA if his
weight changed within a defined range.  (Id. at 282, 415, 426, 580.)

Plaintiff reported on August 4 that he was doing okay and felt better than he had for
a long time.  (Id. at 277-78, 421-22, 575.)

Plaintiff had a positive alcohol screen on September 4.  (Id. at 273.)  When seen in the
clinic that day, Plaintiff complained of depression.  (Id. at 516-20.)

Four days later, Plaintiff had a follow-up visit for his hospitalization.  (Id. at 510-11,
565-66.)  He was continued on his current medications.  (Id. at 511.)

Plaintiff requested on October 31 that the dosage of his sleeping medication,
Temazepam, be increased from 15 milligrams to 30, explaining that it took two 15 milligram
pills for him to fall asleep.  (Id. at 496, 502, 531, 557.)  At some point, the dosage was
increased.  (See id. at 713.)

On November 18, Plaintiff consulted Dr. Kavuru, complaining of "a little bit [of]
fatigue and tiredness."  (Id. at 533-35, 547-50, 652-54.)  He had not changed his dietary,
smoking, or drinking habits.  (Id.)  He had smoked marijuana two weeks earlier.  (Id.)  Dr.
Kavuru concluded that there was nothing to be done at the present time.  (Id. at 535.)
Plaintiff "has normal coronary arteries.  His only problem is he has non-ischemic
cardiomyopathy, probably related to alcohol."  (Id.)  In addition to recommending that

Plaintiff stop drinking and smoking and start eating a proper diet, Dr. Kavuru continued Plaintiff on his current medications with the exception of changing the Metoprolol tartrate to Metoprolol succinate.  (Id.)

When contacted by a VA social worker on December 2 about a referral to the VA's homeless program, Plaintiff explained that he was working at the motel, living in one of the rooms, and was appealing the denial of his disability application.  (Id. at 537, 547.)

In April 2009, Plaintiff's responses on a depression screening test were positive for "mild depression."  (Id. at 731-32, 787-88.)

A chest x-ray taken on May 13 showed no active cardiopulmonary change.  (Id. at 684.)  The cardiomegaly noted in July 2008 had apparently resolved.  (Id.)  An echocardiogram performed the same day revealed hypertrophy in the enlarged left ventricle and a left ventricular ejection fraction of approximately 40 percent.  (Id. at 685-87.) Laboratory tests indicated that Plaintiff had type III hyperlipoproteinemia (HLP).[15]  (Id. at 689.)  Plaintiff complained of a frequent cough which woke him up at night.  (Id. at 700.) Also, he coughed "so hard at times that he black[ed] out."  (Id.)  Pulmonary function tests revealed "very severe obstructive and mild restrictive lung function."  (Id. at 700-01, 722-23, 755-56, 778-79.)

Plaintiff went to the VA Clinic on July 24 with complaints of pain in the left side of his chest with deep breaths, stretching, or coughing.  (Id. at 683, 713-16, 769-70, 772-73.)

---

[15]Type II HLP "is a genetic disorder characterized by accumulation of remnant lipoproteins in the plasma and development of premature atherosclerosis."  Robert W. Mahley, Pathogenesis of type III hyperlipoproteinemia, http://www.jlr.org/content/40/11/1933.abstract (last visited Aug;. 27, 2012).

The pain had begun a week earlier.  (Id. at 714.)  He was described as cooperative, in no apparent distress, and "ill appearing."  (Id.)  It was noted that his complaint of pain did not "correspond with his non-verbal pain behaviors."  (Id. at 716.)  A chest x-ray showed no active pulmonary disease and no changes from the previous chest x-ray.  (Id. at 683.)

Belay E. Tessema, M.D., concluded on October 2 after reviewing Plaintiff's responses to a depression questionnaire that he did not have a mental health condition requiring further intervention.  (Id. at 707, 763.)  On an alcohol use screening test, Plaintiff responded that he had five or six drinks containing alcohol on a typical day when he was drinking during the past year.  (Id. at 710, 766.)  Weekly he had six or more drinks on one occasion.  (Id.)  He weighed 236.6 pounds and had a blood pressure reading of 125/68.  (Id. at 708.).

In addition to the foregoing records of Plaintiff's medical treatment, the ALJ had before him the results of pulmonary function tests and assessments of examining and nonexamining consultants.

Pursuant to his applications, Plaintiff had a spirometric test in October 2008.  (Id. at 642-44.)  His forced expired volume (FEV) in one second was 75 percent of that predicted; his forced vital capacity (FVC) was 101 percent of that predicted; his mean forced expiratory flow during the middle of FVC (FEV25-75%) was 35 percent of that predicted; and his peak expiratory flow (PEF) was 61 percent of predicted.  (Id. at 643.)  The results indicated a moderate obstructive defect.  (Id.)

In December 2008, Joan Singer, Ph.D., completed a Psychiatric Review Technique form (PRTF) for Plaintiff.  (Id. at 661-71.)  Plaintiff was described as having an affective

disorder, i.e., depression; an anxiety-related disorder, i.e., PTSD; and a substance addiction disorder, i.e., alcohol/substance abuse.  (Id. at 661, 664-65, 667.)  These disorders resulted in a mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace.  (Id. at 669.)  There were no episodes of decompensation of extended duration.  (Id.)

Dr. Singer also completed a Mental Residual Functional Capacity Assessment of Plaintiff.  (Id. at 672-74.)  She concluded that in the area of understanding and memory, he was not significantly limited in two abilities and was moderately limited in one, i.e., the ability to understand and remember detailed instructions.  (Id. at 672.)  In the area of sustained concentration and persistence, he was not significantly limited in four of the eight abilities and was moderately limited in the remaining four:  the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and the ability to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace.  (Id. at 672-73.)  In the area of social interaction, he was not significantly limited in all but one of the five abilities, i.e., the ability to accept instructions and respond appropriately to criticism from supervisors.  (Id. at 673.)  And, in the area of adaptation, Plaintiff was not significantly limited in three abilities and was moderately limited in the remaining one:  the ability to set realistic goals or make plans independently of others.  (Id.)

The same month, a Physical Residual Functional Capacity Assessment (PRFCA) of Plaintiff was completed by Christine Mathews, who was a "single decision-maker"[16] and not a medical consultant.  (Id. at 48-53.)  The primary diagnosis was non-ischemic cardiopathy; the secondary diagnosis was hypertension.  (Id. at 48.)  These impairments resulted in exertional limitations of Plaintiff being able to occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; and, stand, walk, or sit for approximately six hours in an eight-hour day.  (Id. at 49.)  His ability to push and pull was otherwise unlimited.  (Id.)  He had postural limitations of being able to only occasionally climb.  (Id. at 50-51.)  He had no manipulative, visual, or communicative limitations.  (Id. at 51-52.)  He had an environmental limitation of needing to avoid even moderate exposure to hazards, e.g., machinery.  (Id. at 52.)  He had no need to avoid "[f]umes, odors, dusts, gases, poor ventilation, etc."  (Id.)

Also pursuant to his applications, Plaintiff was examined and evaluated by Saul D. Silvermintz, M.D., in January 2010.  (Id. at 734-46.)  Plaintiff's chief complaints were of chronic angina, COPD, heart failure, hepatitis C, and anxiety attacks and stress.[17]  (Id. at 734.)  Plaintiff reported having had a heart attack "some years back" – he could not recall exactly when – and being told that "part of his heart was dead."  (Id.)  Since that time, he has had occasional chest pain accompanied by shortness of breath.  (Id.)  He can walk no farther than a couple of blocks before having to stop and catch his breath.  (Id.)  At times, his feet

---

[16]See 20 C.F.R. §§ 404.906, 416.1406 (defining role of single decisionmaker under proposed modifications to disability determination procedures).  See also **Shackleford v. Astrue**, 2012 WL 918864, *3 n.3 (E.D. Mo. Mar. 19, 2012) ("Single decision-makers are disability examiners authorized to adjudicate cases without mandatory concurrence by a physician.") (citation omitted).

[17]Dr. Silvermintz noted that the anxiety attacks and stress complaints were not in his domain.

swell.  (Id.)  He has high blood pressure, which occasionally causes nose bleeds.  (Id.)  "He uses an excessive amount of salt" and does not watch his diet.  (Id.)  He has been told there is nothing that can be done for his chronic heart failure.  (Id.)  He has reduced his smoking habit from three packs of cigarettes a day to one, but cannot quit.  (Id.)  Climbing stairs and, occasionally, bending over make him short of breath.  (Id. at 734-35.)  He drinks three cups of coffee a day and two beers a week.  (Id. at 735.)  He used to be a heavy drinker.  (Id.)  He weighed 244 pounds.  (Id.)  Dr. Silvermintz described him as being a "[w]ell-developed, obese male in no apparent distress."  (Id.)  His blood pressure was 167/102.  (Id.)  On examination, he had inspiratory and expiratory rhonchi and wheezes.  (Id. at 736.)  His heart rhythm and rate were regular.  (Id.)  He had tachycardia plus a mild accentuation of A2.  (Id.)  His extremities were not swollen or edemic.  (Id.)  His gait was normal; he could walk on his heals and toes and could get on and off the table without any difficulty.  (Id.)  He did not have any problems with fine finger movements.  (Id.)  His deep tendon reflexes of his upper and lower extremities were 2+ bilaterally.  (Id.)  He had a slightly reduced range of motion in his right shoulder and in his lumbar spine on flexion-extension.  (Id. at 745-46.)  Dr. Silvermintz's impression was of uncontrolled hypertension; status post myocardial infarction, by history; chronic angina; COPD; moderate obesity; and hepatitis C, by history.  (Id. at 736.)

    Dr. Silvermintz also completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) for Plaintiff.  (Id. at 738-43.)  He assessed him as being able to

- 15 -

occasionally lift and carry up to twenty pounds[18]; to sit for four hours, stand for thirty minutes, and walk for twenty minutes without interruption in an eight-hour work day[19]; to, with his right hand, occasionally reach, handle, finger, and feel, but never push or pull; to, with his right foot, occasionally operate foot controls; to occasionally be exposed to vibrations; and to frequently operate a motor vehicle. (Id. at 738-40, 742.)  Plaintiff did not require use of a cane to walk.  (Id. at 739.)  He should never climb, balance, stoop, kneel, crouch, or crawl.  (Id. at 741.) He should also never be exposed to unprotected heights, moving mechanical parts, humidity and wetness, "[d]usts, odors, fumes and pulmonary irritants," and extreme cold or heat.  (Id. at 742.)  He could, however, engage in activities such as shopping, traveling alone, walking a block at a reasonable pace on an uneven surface, climbing a few steps at a reasonable pace, preparing a simple meal, and caring for his personal hygiene.  (Id. at 743.)

### The ALJ's Decision

The ALJ first noted that Plaintiff met the insured status requirements of DIB through December 31, 2007, but not thereafter.  (Id. at 18.)  Also, although he had alleged a disability onset date of September 2004, he had not established sufficient good cause to reopen his

---

[18]Dr. Silvermintz did not assess the maximum amount of weight Plaintiff could frequently lift and carry.

[19]Dr. Silvermintz did not respond to the request that he identify what activity an individual would be performing for the rest of the eight hours if, as he found, the total time for sitting, walking, and standing did not equal or exceed eight hours.

earlier applications.[20]  (Id. at 19.)  Consequently, the question was whether he had been disabled since the month after his earlier applications were dismissed:  February 2007.  (Id.)

Applying the Commissioner's five-step evaluation process, the ALJ found at step one that Plaintiff had not been engaged in substantial gainful activity since February 2007.  (Id. at 22.)  At step two, the ALJ found that Plaintiff had severe impairments of non-ischemic cardiopathy, hypertension, and COPD.  (Id.)  Plaintiff's ankle, joint, and neck problems were not severe.  (Id.)  The first had not been reported to physicians "very much"; the second and third had not been reported at all.  (Id.)  None had been observed by physicians.  (Id.)  Plaintiff's hepatitis C was not a severe impairment; no significant work-related limitations had been placed on Plaintiff as a result of his hepatitis.  (Id. at 23.)  His mental impairments were also not severe.  (Id.)  None had resulted in any work-related limitations; none had been consistently observed.  (Id.)  And, none resulted in a degree of functional limitation sufficient to satisfy the listing criteria.  (Id.)

At step three, the ALJ determined that Plaintiff's severe impairments, singly or in combination, did not satisfy any listing criteria.  (Id. at 23-24.)

Plaintiff had, the ALJ concluded, the residual functional capacity (RFC) to lift and carry no more than ten pounds frequently and twenty pounds occasionally and to sit, stand, and or walk for up to six hours each in an eight-hour day.  (Id. at 24.)  Plaintiff should avoid concentrated exposure to respiratory irritants.  (Id.)

_____

[20]See note 2, supra.

When assessing Plaintiff's RFC, the ALJ evaluated his credibility.  (Id. at 19-22, 24.)
Detracting from that credibility were Plaintiff's earnings record; his daily activities; an
observation by a telephone interviewer that Plaintiff had no notable problems breathing,
understanding, concentrating, talking, and answering questions[21]; Plaintiff's failure to take
prescribed medication and to comply with recommendations to stop smoking; and the
objective medical evidence, which the ALJ summarized in detail.  (Id. at 19-20.)  The ALJ
also considered the opinion of Dr. Silvermintz when assessing Plaintiff's credibility and found
it to be unsupported "by medically acceptable clinical and laboratory diagnostic techniques"
and inconsistent with other medical evidence, including Dr. Silvermintz' own examination
findings.  (Id. at 24-25.)

The ALJ next determined at step four that with his RFC, Plaintiff could not return to
his past relevant work.  (Id. at 25.)

At step five, the ALJ found that with Plaintiff's age (closely approaching advanced
age), high school education, and RFC for the full range of light work, he was not disabled
under Rule 202.14 of the Medical-Vocational Guidelines.  (Id. at 25.)

Plaintiff was not, therefore, disabled within the meaning of the Act.  (Id.)

### Additional Records Before the Appeals Council

After the ALJ rendered his adverse decision, Plaintiff's counsel submitted additional
records to the Appeals Council, including a letter written in support of Plaintiff's applications,
an assessment of his RFC, later medical records, and high school records.

---

[21]See Id. at 187-88.

Ms. Keith wrote the Social Security Administration in June 2010 that she had known Plaintiff since 2001 and has seen a definite decline in his health during that time. (Id. at 790.) He becomes short of breath with minimal exertion; often looks ashen; cannot tolerate simple activities; and needs help with such tasks as shopping and cleaning. (Id.)

A computed tomography (CT) scan in July 2010 of Plaintiff's neck showed no abnormalities. (Id. at 814.)

An August 2010 ultrasound was done of Plaintiff's bilateral carotid to investigate a mass on the left side of his neck and dizziness. (Id. at 813-14.) It revealed intimal thickening and intermittent plague in the common carotid arteries and mild plague in the internal carotid arteries, resulting in less than 30 percent stenosis, but no evidence of a hemodynamically significant stenosis or of a definite mass adjacent to the carotid in the left side of his neck. (Id.)

A November 2010 CT scan of Plaintiff's thorax revealed a prominent left submandibular gland and diffuse fatty infiltration of visualized portion of neck. (Id. at 812-13.) Plaintiff was to have a CT scan of his abdomen in eight to ten weeks. (Id. at 813.) The CT scan was performed in March 2011, revealing diffuse fatty infiltration of the liver, a solid lesion on the left adrenal gland, and a small solid or cystic lesion on the right kidney. (Id. at 811-12.) A repeat scan in three months was recommended. (Id. at 812.)

When seen the previous month at the VA Clinic by Susan J. Smith, a VA family nurse practitioner, it was noted that Plaintiff was "very red in the face as he has been on previous visits." (Id. at 839.) An examination of his neck was positive for cervical lymphadenopathy.

(Id. at 839.)  He still had a large thickening on his left shoulder, bilateral wheezing, and "very decreased breath sounds."  (Id.)  He was to return in one month or earlier if needed.  (Id. at 840.)

At the request of Plaintiff's counsel, Ms. Smith completed a Medical Source Statement – Physical for Plaintiff in November 2010.  (Id. at 797-800.)  Asked to provide her diagnoses of Plaintiff, she listed depression; PTSD; chronic hepatitis C; hypertension; cardiomyopathy, alcoholic; and tobacco use disorder.  (Id. at 797.)  During an eight-hour workday, Plaintiff could sit, stand, and walk for fifteen minutes each.  (Id.)  He could not lift or carry even five pounds.  (Id. at 798.)  He was limited in his ability to balance.  (Id.)  He could occasionally reach above his head, but could never stoop.  (Id.)  His pain would preclude him from "persisting or focusing on simple-tasks on a sustained full-time work schedule."  (Id. at 799.) He would have to be absent at least three times a month and to be late as frequently.  (Id.) Because of his congestive heart failure, he would have to lie down or take a nap during an eight-hour workday.  (Id.)  His described limitations would last at least twelve months.  (Id.)

The majority of Plaintiff's grades in junior high school and high school were Cs.  (Id. at 803-04.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A).  The impairment

suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; **Hurd v. Astrue**, 621 F.3d 734, 738 (8th Cir. 2010); **Gragg v. Astrue**, 615 F.3d 932, 937 (8th Cir. 2010); **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009).  "Each step in the disability determination entails a separate analysis and legal standard."  **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006).  First, the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R. §§ 404.1520(b), 416.920(b); **Hurd**, 621 F.3d at 738.  Second, the claimant must have a severe impairment.  See 20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ."  Id.  Accord **Martise v. Astrue**, 641 F.3d 909, 923 (8th Cir. 2011); **Pelkey v. Barnhart**, 433 F.3d 575, 578 (8th Cir. 2006).  Conversely, "[a]n impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to work," i.e., "[it] would have no more than a minimal effect on the claimant's ability to work . . . ."  **Kirby v. Astrue**, 500 F.3d 705, 707 (8th Cir. 2007).  "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard . . . ."  **Id.** at 708 (internal citations omitted).

- 21 -

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1.  If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)).  "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).  "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record.  [A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)) (second alteration in original).

- 22 -

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002)).   This evaluation requires that the ALJ consider "'(1) the claimant's daily activities; (2) the duration, intensity, and frequency, and intensity of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'" **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011) (quoting Moore, 572 F.3d at 524, which cited Polaski v. Heckler, 739 F.2d 1320,  1322 (8th Cir. 1984)).   "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Wagner**, 499 F.3d at 851 (quoting Pearsall, 274 F.3d at 1218).   After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints.  **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past."  20 C.F.R. §§ 404.1520(e), 416.920(e).  The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work.  **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).  See also 20 C.F.R. §§ 404.1520(f), 416.920(f).

> "If [a claimant's] impairments are exertional (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the medical-vocational guidelines or 'grids,' which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment."

**Holley v. Massanari**, 253 F.3d 1088, 1093 (8th Cir. 2001) (quoting Beckley, 152 F.3d at 1059).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001).  "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)).  When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the

Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. "If, [however,] after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." **Partee**, 638 F.3d at 863 (quoting Goff, 421 F.3d at 789). See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

### Discussion

Plaintiff argues that the ALJ erred when (1) assessing his credibility; (2) evaluating Dr. Silvermintz' opinion; (3) assessing his RFC; and (4) failing to elicit testimony by a vocational expert (VE).

Credibility.  "'If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [the Court] will normally defer to the ALJ's credibility determination.'" **Renstrom v. Astrue**, 680 F.3d 1057, 1065 (8th Cir. 2012) (quoting Juszcyzk v. Astrue, 542 F.3d 626, 632 (8th Cir. 2008)).  One reason given by the ALJ was the lack of supporting objective evidence.  For instance, Plaintiff's complaints of difficulties walking and of swollen ankles were not supported by findings in his medical records that he did not have swollen extremities, did not need an assistive device to walk, and had a normal gait.  Although "'[a]n

ALJ may not discount a claimant's subjective complaints solely because the objective medical evidence does not fully support them," **id.** at 1066 (quoting Wiese, 552 F.3d at 733), the absence of objective medical evidence to support a claimant's complaints is a proper consideration when assessing that claimant's credibility, see **Mouser v. Astrue**, 545 F.3d 634, 638 (8th Cir. 2008).

Another reason given was Plaintiff's poor work history; this also is properly considered as detracting from a claimant's credibility.  **Buckner**, 646 F.3d at 558; **Wildman v. Astrue**, 596 F.3d 959, 968-69 (8th Cir. 2010); **Pearsall**, 274 F.3d at 1218.  In only three of the eleven years in which Plaintiff had reportable earnings were the amounts sufficient to be considered substantial gainful activity.  See Record at 160; Social Security Administration, Substantial Gainful Activity, http://www.socialsecurity.gov/OACT/COLA/sga.html (last visited Aug. 28, 2012) (listing monthly substantial gainful activity amounts for years 1975 through 2012, inclusive).  In the twenty years between 1990 and 2009, inclusive, Plaintiff had earnings in only eleven years.  (R. at 160.)  He had no earnings after 2002 – the year in which he had the highest reportable earnings.

Also relevant is the inconsistency between Plaintiff's testimony about, and reporting of, his severely restricted daily activities and his ability to clean rooms in exchange for room and board.  See **Renstrom**, 680 F.3d at 1067 (daily activities, including daily chores and ability to provide self care, "indicated a lesser impairment than [claimant] claimed in testimony).  Moreover, Plaintiff's testimony is inconsistent with the paucity of treatment. Plaintiff had no medical treatment between August 2005 and July 2008, when he was

- 26 -

hospitalized for six days for complaints of COPD and hypertension and then discharged in fair condition.  Three days after discharge, Plaintiff reported doing okay and feeling better than he had for a long time.  He complained of depression the following month, but refused medication.  When he saw the cardiologist two months later, he had not stopped his contributory habits and was continued on is current medication.  He next saw treatment five months later and was screened positive for mild depression.  See **Id.** at 1066 (severity of reported impairments inconsistent with medical evidence and course of treatment).  Other inconsistencies include his report of not being very sociable and the consistent reference in his medical records to having been brought to various appointments by friends and his report that his impairments prevented him from working as of September 2004, yet he had no earnings after 2002.  An "ALJ may discredit a claimant based on inconsistencies in the evidence." **Partee**, 638 F.3d at 865 (citing Goff, 421 F.3d at 792).  See also **Roberson v. Astrue**, 481 F.3d 1020, 1025 (8th Cir. 2007) ("[A]n ALJ . . . may discount the claimant's subjective complaints if there are inconsistencies in the record as a whole.").

Additionally, a claimant's noncompliance with a treatment regimen is a valid reason for discrediting his complaints.  See **Wildman**, 596 F.3d at 969.  The records before the ALJ include references to Plaintiff not taking prescribed medication and not following his physicians' recommendations to stop smoking and drinking and start eating an appropriate diet.

The ALJ having evaluated Plaintiff's credibility under the proper criteria, his adverse assessment will not be set aside.[22]

Dr. Silvermintz.  The ALJ found the assessment of Dr. Silvermintz of Plaintiff's work-related limitations to be (a) inconsistent with other medical records and with Dr. Silvermintz' own examination findings and (b) unsupported by clinical and laboratory diagnostic techniques.  Plaintiff argues that the ALJ erroneously analyzed Dr. Silvermintz' findings under the standard for treating physicians and that this error requires reversal and remand.  It is undisputed that Dr. Silvermintz was a consulting physician, not Plaintiff's treating physician.

When recently affirming an ALJ's decision to not accept a *consulting* physician's functional limitation findings because they were inconsistent with the physician's own report, the Eighth Circuit Court of Appeals noted that it has "previously held that '[p]hysician opinions that are internally inconsistent . . . are entitled to less deference than they would receive in the absence of inconsistencies.'"  **Perks v. Astrue**, — F.3d — , 2012 WL 3168495, *3 (8th Cir. 2012) (quoting Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005)) (alterations in original).

Because the inconsistencies in Dr. Silvermintz' assessment was a proper consideration, any error by the ALJ in citing standards governing the evaluation of treating physicians'

---

[22]Plaintiff argues that the ALJ erred when evaluating his credibility by not considering the side effects of his medication; precipitating and aggravating factors; and his status as a veteran.  Plaintiff testified and reported that there were no medication side effects (other than from his medication for a skin condition); the record does not include any reference to precipitating or aggravating factors; and Plaintiff fails to identify how his status as a veteran influences his credibility.

reports had no bearing on the outcome and does not require a remand.  See **Buckner**, 646 F.3d at 560; **Hepp v. Astrue**, 511 F.3d 798, 806 (8th Cir. 2008).

RFC.  As noted above, "[t]he RFC 'is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities,' despite his or her physical or mental limitations." **Roberson**, 481 F.3d at 1023 (quoting Social Security Ruling 96-8p, 1996 WL 374184, at *3 (S.S.A. 1996)); accord **Masterson v. Barnhart**, 363 F.3d 731, 737 (8th Cir. 2004); **Depover v. Barnhart**, 349 F.3d 563, 567 (8th Cir. 2003). "When determining a claimant's RFC, the ALJ must consider all relevant evidence, including the claimant's own description of her or his limitations, as well as medical records, and observations of treating physicians and others." **Roberson**, 481 F.3d at 1023.  See also Social Security Ruling 96-8p, 1996 WL 374184 at *5 (listing factors to be considered when assessing a claimant's RFC, including, among other things, medical history, medical signs and laboratory findings, effects of treatment, medical source statements, recorded observations, and "effects of symptoms . . . that are reasonably attributed to a medically determinable impairment").

Plaintiff argues that the ALJ's error when evaluating Dr. Silvermintz' opinion resulted in an erroneous RFC assessment.  Because the ALJ did not err in that evaluation, Plaintiff's argument is unavailing.

Plaintiff further argues that the ALJ erred by not considering the effect of his obesity on his RFC.[23]  Obesity is to be considered "a 'severe' impairment when, alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities." Social Security Ruling 02-01p, 2000 WL 628049 at *4.  "There is[, however,] no specific level of weight or BMI [body mass index] that equates with a 'severe' or a 'not severe' impairment." Id.

As noted by the Commissioner, Plaintiff did not cite obesity as a condition affecting his functioning when applying for DIB and SSI or when testifying.  The burden of establishing that his obesity is a severe impairment is on Plaintiff, see **Nguyen v. Chater**, 75 F.3d 429, 430 (8th Cir. 1996), which he failed to carry.

VE.  Plaintiff next argues that the ALJ erred by not eliciting testimony from a vocational expert (VE) after finding that he had an environmental limitation of needing to avoid concentrated exposure to respiratory irritants.  The Commissioner counters that a need to avoid concentrated exposure to dust has no impact on "'the broad world of work.'" (Def. Br. at 9, ECF No. 19, quoting Social Security Ruling 85-15).

---

[23]The Court notes that Plaintiff calculated his body mass index (BMI) using a height of 5 feet 8 inches tall.  (See Pl. Br. at 13, ECF No. 16.)  His medical records and his own report list his height as 5 feet 10 inches tall.  Consequently, his BMI in July 2008 was 30.4, not 32.2 as claimed, and in October 2009 was 34.3, not 35.9.  See Nat'l Inst. of Health, Calculate Your Body Mass Index, http://www.nhlbisupport.com/bmi/ (last visited Aug. 28, 2012).  Regardless, a BMI of 30 or greater is considered obesity.  There are three levels of obesity.  Social Security Ruling 02-01p, 2000 WL 628049, *2 (S.S.A. 2002).  "Level I includes BMIs of 30.0-34.9." Id.  Plaintiff's BMIs are within this level.

"Where a claimant does not suffer from nonexertional impairments or where such impairments do not diminish or significantly limit the claimant's residual functional capacity to perform the full range of Guideline-listed activities, the Commissioner may conduct this inquiry [at step five] by consulting the Medical–Vocational Guidelines (the Grids).  However, where the claimant suffers from a nonexertional impairment . . . , the ALJ must obtain the opinion of a vocational expert instead of relying on the Medical–Vocational Guidelines." **Collins v. Astrue**, 648 F.3d 869, 871-72 (8th Cir. 2011) (internal quotations and citations omitted).

When considering a claimant's need to avoid certain environments, an ALJ must specify in his RFC "which environments are restricted and state the extent of the restriction; e.g., whether only excessive or even small amounts of dust must be avoided."  Social Security Ruling 96-9p, 1996 WL 374185, *9 (S.S.A. 1996).  A respiratory impairment "may cause both exertional limitations and environmental restrictions."  Social Security Ruling 85-15, 1985 WL 56857, *2 (S.S.A. 1985).  In his RFC, the ALJ specified the extent of the restriction, i.e., Plaintiff must avoid concentrated exposure, but qualified the restriction simply as "respiratory irritants."

In **Forsythe v. Sullivan**, 926 F.2d 774, 776 (8th Cir. 1991), the Eighth Circuit reversed and remanded a case after finding that the ALJ had erred by not calling a VE to supplement the Guidelines on whether a claimant with mild COPD and an RFC prohibiting him from working in an environment with respiratory irritants could perform a significant number of jobs existing in the national economy.  In **Burnside v. Apfel**, 223 F.3d 840, 845 (8th Cir.

2000), the court reversed and remanded a case for a determination by the ALJ and a VE whether a claimant with moderate COPD and a need to avoid "dusty work environment" could perform the full range of light work.

Given Plaintiff's severe impairment of COPD and a need to avoid concentrated exposure to respiratory irritants, the ALJ erred by not eliciting testimony from a VE about the effect of this restriction on Plaintiff's ability to perform the full range of light work.

<u>Conclusion</u>

The ALJ's determination that Plaintiff could perform the full range of light work is not supported by substantial evidence on the record as a whole because it was made without eliciting testimony by a VE on the effect of his environmental limitation on his ability to do so.  Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is REVERSED and this case is REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for the further, limited proceedings as set forth above.

An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  29th  day of August, 2012.